1  XAVIER BECERRA
   Attorney General of California
2  STEPAN A. HAYTAYAN
   Supervising Deputy Attorney General
3  P. PATTY LI
   Deputy Attorney General
4  JONATHAN M. EISENBERG
   Deputy Attorney General
5  State Bar No. 184162
    300 South Spring Street, Suite 1702
6   Los Angeles, CA  90013
    Telephone:  (213) 897-6505
7   Fax:  (213) 897-5775
    E-mail:  Jonathan.Eisenberg@doj.ca.gov
8  *Attorneys for Defendant Xavier Becerra,*
   *Attorney General of the State of California*
9
               IN THE UNITED STATES DISTRICT COURT
10
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
11
                        WESTERN DIVISION
12

13

| | |
|---|---|
| **MICHELLE FLANAGAN, et al.,** | 2:16-cv-06164-JAK-AS |
| Plaintiffs, | **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **v.** | |
| **CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,** | Date:          November 6, 2017<br>Time:          8:30 a.m.<br>Courtroom:  10B<br>Judge:        Hon. John A. Kronstadt<br>Action Filed: August 17, 2016 |
| Defendants. | |

PLEASE TAKE NOTICE that, on November 6, 2017, at 8:30 a.m., or as soon thereafter as the matter may be heard, before the Honorable John A. Kronstadt, U.S. District Judge, in Courtroom 10B of the U.S. District Court for the Central District of California, located at 350 West First Street, Los Angeles, California 90012, Defendant Xavier Becerra, sued in his official capacity as Attorney General of the State of California ("Defendant"), will move this Court for summary judgment on the August 17, 2016, complaint for declaratory and injunctive relief (the

"Complaint") of Plaintiffs Michelle Flanagan, Samuel Golden, Dominic Nardone, Jacob Perkio, and the California Rifle and Pistol Association ("CRPA"; together with the other Plaintiffs, "Plaintiffs"), under Federal Rule of Civil Procedure 56.

Defendant seeks summary judgment on the only remaining claim for relief per the Court's order (ECF No. 39) on Defendant's earlier motion to dismiss (ECF No. 24): the claim under the Second and Fourteenth Amendments to the United States Constitution, "based on the open carry limitations" (ECF No. 39 at 6).  These "open carry limitations" are identified in the Complaint's Prayer for Relief as California Penal Code sections 25850, 26350, 26400, and 26150(b)(2).  Complaint (ECF No. 1) at 19 (Prayer for Relief ¶ 3).

This motion for summary judgment is brought on the basis that no genuine issue of material fact exists as to whether (1) the Second Amendment to the U.S. Constitution has been historically understood to recognize an individual right of every law-abiding citizen to carry a firearm openly in public for the purpose of self-defense, under almost all circumstances, meaning that Plaintiffs cannot prove that California's open-carry laws violate the Second Amendment, as alleged in the Complaint; and (2) even if the Second Amendment has been historically understood to recognize such a right, the State of California has, as a matter of law, sufficiently important governmental interests in maintaining those laws, and there is a reasonable fit between those laws and the governmental interests, such that the laws survive constitutional scrutiny.

This motion is based on this notice, the accompanying memorandum of points and authorities, the request for judicial notice and attached exhibits, the declaration of P. Patty Li and attached exhibits, the Statement of Uncontroverted Facts and Conclusions of Law, the papers and pleadings already on file in this action, and such matters as may be presented to the Court at the hearing.

//

//

1       This motion is made following the conference of counsel under L.R. 7-3,

2  which took place on September 1, 2017.

3

4  Dated:  September 11, 2017              Respectfully submitted,

5                                  XAVIER BECERRA
                                Attorney General of California

6                                  STEPAN A. HAYTAYAN
                                Supervising Deputy Attorney General

7                                  P. PATTY LI
                                Deputy Attorney General

8

9                                  /s/ Jonathan M. Eisenberg

10                                 JONATHAN M. EISENBERG
                                Deputy Attorney General

11                                 *Attorneys for Defendant Xavier
                                Becerra, Attorney General of the State*

12                                 *of California*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTORNEY GENERAL'S MOTION FOR
SUM. JUDGMENT (2:16-cv-06164-JAK-AS)

XAVIER BECERRA
Attorney General of California
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General
P. PATTY LI
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
State Bar No. 184162
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 897-6505
  Fax:  (213) 897-5775
  E-mail:  Jonathan.Eisenberg@doj.ca.gov
*Attorneys for Defendant Xavier Becerra,*
*Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION (TEMPLE STREET)

| | |
|---|---|
| **MICHELLE FLANAGAN, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,**<br><br>Defendants. | 2:16-cv-06164-JAK-AS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Date:          November 6, 2017<br>Time:          8:30 a.m.<br>Courtroom:   10B<br>Judge:         Hon. John A. Kronstadt<br>Action Filed: August 17, 2016 |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................ 1

Background ................................................................................................. 3

    I.     California's Public-Carry Laws ........................................... 3

    II.    The Present Lawsuit ............................................................ 4

        A.    The Complaint ........................................................ 4

        B.    The Motion to Dismiss .......................................... 5

Standard for Motion for Summary Judgment ........................................... 6

Relevant Substantive Law ......................................................................... 6

Argument .................................................................................................... 7

    I.     California's Open-Carry Laws Do Not Burden Conduct Historically Understood to Be Protected By the Second Amendment ......................................................................... 8

        A.    Widespread, Substantial Restrictions on Open Carry in Public Places Date Back Many Centuries in Anglo-American tradition ....................................................... 9

            1.    Restrictions on Open Carry in England, 1300-1800 ........ 9

            2.    Restrictions on Open Carry in the American Colonies and the United States, Before and Just After the Civil War ............................................ 10

                A.    Statutes ....................................................... 10

                B.    Case Law ..................................................... 11

                C.    Local Regulations ...................................... 12

            3.    Restrictions On Open Carry in the United States in the 1900s ................................................ 13

        B.    *Heller* and Other Modern Cases Recognize That Public Carry of Firearms Has Been Historically Regulated, Consistent with the Second Amendment .................................................. 13

        C.    The D.C. Circuit's Opinion in *Wrenn* is not persuasive .......... 14

    II.    If California's Open-Carry Laws Implicate the Second Amendment, the Laws Should Be Evaluated Under Intermediate Scrutiny ........................................................ 17

    III.   California's Open-Carry Laws Satisfy Intermediate Scrutiny .......... 19

        A.    California Has a Significant Interest in Protecting Public Safety ............................................................. 19

        B.    There Is a Reasonable Fit Between California's Open-Carry Laws and the Protection of Public Safety ..................... 20

            1.    "Reasonable Fit" Requires Deference to the Legislature's Judgment ................................. 20

1
2

**TABLE OF CONTENTS**
**(continued)**

**Page**

3    2.   California's Open-Carry Laws Reduce Violent
Crime and Enhance Public Safety................................21

4        A.   California's Open-Carry Laws Reduce
Violent Crime......................................................21

5

6        B.   California's Open-Carry Laws Enhance
Public Safety. ......................................................24

7        C.   Defendant's Evidence Establishes a
"Reasonable Fit" Sufficient to Survive

8             Intermediate Scrutiny...........................................25

9    Conclusion ............................................................................25

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMO OF P's & A's RE: MTN. FOR SUM.
JUDGMENT (2:16-cv-06164-JAK-AS)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Andrews v. State*
   50 Tenn. 165 (1871) ................................................................ 11, 16

*Bauer v. Becerra*
   858 F.3d 1216 (9th Cir. 2017) ...................................................... 7, 17

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ....................................................................... 6

*City of Salina v. Blaksley*
   83 P. 619 (Kan. 1905) .................................................................... 13

*Cockrum v. State*
   24 Tex. 394 (1859) ........................................................................ 15

*District of Columbia v. Heller*
   554 U.S. 570 (2008) .............................................................. *passim*

*Drake v. Filko*
   724 F.3d 426 (3d Cir. 2013) ..................................................... 14, 21

*English v. State*
   35 Tex. 473 (1871) .............................................................. 1, 2, 15

*Fyock v. Sunnyvale*
   779 F.3d 991 (9th Cir. 2015) .............................................. 8, 20, 25

*Jackson v. City & Cty. of San Francisco*
   746 F.3d 953 (9th Cir. 2014) ............................................. 7, 17, 20

*Johnson v. Tompkins*
   13 F. Cas. 840 (E.D. Penn. 1833) ........................................... 15, 16

*Kachalsky v. County of Westchester*
   701 F.3d 81 (2d Cir. 2012) ............................................. 14, 17, 21

*Kolbe v. Hogan*
   849 F.3d 114 (4th Cir. 2017) ...................................................... 17

MEMO OF P's & A's RE: MTN. FOR SUM.
JUDGMENT (2:16-cv-06164-JAK-AS)

**TABLE OF AUTHORITIES**
(continued)

Page

*Lorillard Tobacco Co. v. Reilly*
   533 U.S. 525 (2001) ...................................................................20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) .....................................................................6

*McDonald v. City of Chicago*
   561 U.S. 742 (2010) .....................................................................1

*Moore v. Madigan*
   702 F.3d 933 (7th Cir. 2012)................................................14, 18

*Nunn v. State*
   1 Ga. 243 (1846)..........................................................12, 15

*Peruta v. County of San Diego*
   824 F.3d 919 (9th Cir. 2016) (en banc)........................................*passim*

*Silvester v. Harris*
   843 F.3d 816 (9th Cir. 2016)........................................................*passim*

*State v. Chandler*
   5 La. Ann. 489 (1850) ................................................................15

*State v. Huntley*
   3 Ired. 418 (1843) .....................................................................11

*State v. Langford*
   10 N.C. 381 (1824).....................................................................1, 2

*State v. Lanier*
   71 N.C. 288 (1874)..................................................................1, 2, 11

*State v. Roten*
   86 N.C. 701 (1882).....................................................................12

*Turner Broad. Sys., Inc. v. F.C.C.*
   512 U.S. 622 (1994) ...................................................................20

*Turner Broad. Sys., Inc. v. F.C.C.*
   520 U.S. 180 (1997) ...................................................................21

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Woollard v. Gallagher*
  712 F.3d 865 (4th Cir. 2013) ................................................................. 17

*Wrenn v. District of Columbia*
  864 F.3d 650 (D.C. Cir. 2017) ......................................................... *passim*

STATUTES

California Penal Code
  § 17030 ............................................................................................... 3
  § 25400 ............................................................................................... 3
  § 25450 ............................................................................................... 3
  § 25605 ............................................................................................... 3
  § 25620 ............................................................................................... 3
  § 25630 ............................................................................................... 3
  § 25640 ............................................................................................... 3
  § 25650 ............................................................................................... 3
  § 25850 ............................................................................................... 5
  § 25850(a) ........................................................................................ 3, 5
  § 25900 ............................................................................................... 3
  § 26030 ............................................................................................... 3
  § 26035 ............................................................................................... 3
  § 26045 ............................................................................................... 4
  § 26045(a) ......................................................................................... 18
  § 26050 ............................................................................................... 4
  § 26055 ............................................................................................... 3
  § 26150 ............................................................................................... 4
  § 26150(a)(2) ................................................................................... 4, 5
  § 26150(b) ........................................................................................... 4
  § 26150(b)(2) ............................................................................. 4, 5, 18
  § 26155(a)(2) ....................................................................................... 4
  § 26155(b)(2) ................................................................................. 4, 18
  § 26160 ............................................................................................... 4
  § 26350(a) ........................................................................................... 3
  § 26350(a)(1) ....................................................................................... 5
  § 26366 ............................................................................................... 3
  § 26400 ............................................................................................... 3
  § 26400(a) ........................................................................................... 5

# TABLE OF AUTHORITIES
## (continued)

Page

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    First Amendment ................................................................................. 1
    Second Amendment .................................................................... *passim*
    Fourteenth Amendment ...................................................................... 5

**COURT RULES**

Fed. R. Civ. P.
    Rule 56(a) ........................................................................................... 6
    Rule 56(c) ........................................................................................... 6

**OTHER AUTHORITIES**

John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS.
    400 (1934) ......................................................................................... 13

Patrick J. Charles, *The Faces of the Second Amendment Outside the
Home: History Versus a Historical Standard of Review*, 60 Clev.
    St. L. Rev. 1, 10-13 (2012) ........................................................... 9, 10

Patrick J. Charles, *The Faces of the Second Amendment Outside the
Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV.
    ST. L. REV. 373 (2016) .......................................................... 10, 11, 12

Saul Cornell, *The Right to Carry Firearms Outside of the Home:
Separating Historical Myths from Historical Realities*, 39
    FORDHAM URB. L.J. 1695 (2012) .................................................. 12, 15

Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American
Law:  Preserving Liberty and Keeping the Peace*, 80 LAW &
    CONTEMP. PROBS. 11 (2017) ............................................................. 10

Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in
America* (2011) ................................................................................. 12

1    Defendant Xavier Becerra, Attorney General of the State of California, sued in

2    his official capacity ("Defendant"), submits this memorandum of points and

3    authorities in support of Defendant's motion for summary judgment.

4                                  **INTRODUCTION**

5           The Second Amendment to the United States Constitution recognizes an

6    individual right to have a firearm for self-defense, and that right encompasses the

7    possession of a handgun within the home.  *District of Columbia v. Heller*, 554 U.S.

8    570, 599, 628-29 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 749-

9    50 (2010) (reiterating *Heller*'s holding).  To date, the Supreme Court has not

10   recognized a personal right to carry a firearm outside the home.  And as *Heller*

11   emphasizes, circumstances matter:  "we do not read the Second Amendment to

12   protect the right of citizens to carry arms for *any sort* of confrontation, just as we do

13   not read the First Amendment to protect the right of citizens to speak for *any*

14   *purpose*."  *Heller*, 554 U.S. at 595 (emphasis in original).  In fact, *Heller* discusses

15   approvingly several restrictions on the carrying of firearms in public places.  *See*

16   *id.* at 626-27.  This discussion does not comport with Plaintiffs' prayer for relief in

17   this case, which would enshrine a broad right of law-abiding citizens to carry

18   firearms in public under almost all circumstances.

19          Although *Heller* did not attempt to address how the Second Amendment

20   might apply in circumstances other than those presented by that case itself, *Heller*

21   instructed lower courts to discern the Second Amendment's meaning by reference

22   to the historical understanding of the Second Amendment.  *See Heller*, 554 U.S. at

23   595, 598 (giving that instruction); *see also id.* at 605-19 (conducting historical

24   review of one aspect of Second Amendment).  *Heller* favorably cited three 19th-

25   century state-court decisions—*State v. Langford*, 10 N.C. 381 (1824); *English v.*

26   *State*, 35 Tex. 473 (1871); and *State v. Lanier*, 71 N.C. 288 (1874)—that address

27   the right to keep and bear arms as applied in public places.  554 U.S. at 627.  The

28   three decisions upheld public-carry regulations because they (A) preclude "terror to

the people" who observe other people carrying firearms in public (*Langford*, 10 N.C. at 383), (B) minimize "licentiousness" and the breakdown of the social compact (*English*, 35 Tex. at 477), and/or (C) preserve "the public peace" (*Lanier*, 71 N.C. at 289). These cases, whose continued relevance *Heller's* approving recognition confirmed, show that the Second Amendment does not confer the broad, lightly restricted public-carry right that Plaintiffs have asserted here.

The cases also reflect the mainstream Anglo-American legal tradition pre-dating the Second Amendment, and encompassing case law, statutes, and regulations, which together historically limited the carrying of firearms in public and are incompatible with the expansive right that Plaintiffs now assert. Specifically, mainstream restrictions historically have outlawed carry in public (openly or otherwise) based on only a presumed, general need for self-defense. And California's public-carry statutes are no more—indeed, are less—restrictive than the historical mainstream of such regulations. California's laws respect any Second Amendment right to self-defense in public places, as that concept has been historically understood. California's statutes, unlike some more restrictive historical examples, include multiple exceptions or accommodations for people who have bona fide needs to carry firearms in public. For those reasons, California's statutes do not burden the Second Amendment right, either as contemplated in *Heller* or as historically understood.

If the Court determines or assumes that California's open-carry laws do implicate the Second Amendment, then the Court should apply intermediate scrutiny to the laws, because they do not regulate the core Second Amendment right or impose severe burdens on the exercise of the right. California's open-carry laws readily withstand intermediate scrutiny. In the enforcement of these statutes, California has indisputably important governmental interests, including bolstering public safety by minimizing chances for firearm violence in public. And expert opinion, social-science data, and common sense all demonstrate that there is a

reasonable fit between California's open-carry laws and the fulfillment of those objectives.

The Court should therefore grant Defendant's motion for summary judgment.

## BACKGROUND

### I.   CALIFORNIA'S PUBLIC-CARRY LAWS

California law permits the carrying of firearms in public under certain circumstances, commonly where a self-defense need might arise.  A California resident who is over 18 years old and not otherwise prohibited from possessing firearms may generally keep or carry a loaded handgun not only in the person's home (as guaranteed by *Heller*) but also in the person's place of business.  CAL. PENAL CODE §§ 25605, 26035.  Carrying is also generally permitted at a temporary residence or campsite.  *Id*. § 26055.  A person generally may also carry a loaded handgun in public areas outside incorporated cities where it would be lawful to discharge the weapon.  *See id.* §§ 25850(a), 17030.  Licensed hunters and fishers may carry handguns while engaged in those activities.  *Id.* §§ 25640, 26366. Certain types of individuals, such as peace officers, military personnel, and private security personnel, likewise may carry firearms in public under various circumstances.  *See id.* §§ 25450, 25620, 25630, 25650, 25900, 26030.

State law generally prohibits the public carrying, whether open or concealed, of a loaded firearm (handgun or long gun) or unloaded handgun in "any public place or on any public street" in incorporated cities.  CAL. PENAL CODE § 25850(a); *see id.* §§ 25400, 26350(a).  A similar restriction applies in public places or on public streets in a "prohibited area" of unincorporated territory—that is, an area where it is unlawful to discharge a weapon.  *Id.* §§ 25850(a), 26350(a); *see id.* § 17030.  State law also generally precludes carrying an unloaded long gun in public places within the State's incorporated cities.  *Id*. § 26400.

There is a focused self-defense exception to all of these restrictions, allowing the carrying of a loaded firearm by any individual who reasonably believes that

doing so is necessary to preserve a person or property from an immediate, grave danger, while if possible notifying and awaiting the arrival of law enforcement. CAL. PENAL CODE § 26045. There is also an exception for a person making or attempting to make a lawful arrest. *Id.* § 26050. And invocations of these exceptions do not require a license or permit. *Id*. §§ 26045, 26050.

California law also recognizes and accommodates the need or desire of some individuals to carry a handgun in public in situations not otherwise provided for by law. State law allows any otherwise qualified resident to seek a permit to carry a handgun, even in an urban or residential area, for "[g]ood cause." CAL. PENAL CODE §§ 26150(a)(2), 26155(a)(2). Such a permit authorizes the carrying of a handgun in a concealed manner, although in counties with populations of less than 200,000 persons, the permit may alternatively allow the carrying of a handgun in an "exposed" (i.e., open) manner. *Id.* §§ 26150(b)(2), 26155(b)(2). The California Legislature has delegated to local authorities (county sheriffs or city police chiefs) the authority to determine what constitutes "good cause" for the issuance of such a permit in local areas. *See id.* §§ 26150, 26155, 26160.

## II. THE PRESENT LAWSUIT

### A. The Complaint

Plaintiffs are four individuals and an organization, CRPA. Compl. ¶¶13-20. The four individual plaintiffs are residents of Los Angeles County who applied for concealed-carry weapons ("CCW") permits with the Los Angeles County Sheriff, but were rejected for lack of "good cause." *Id*. ¶¶ 15-19, 59-60. The individual plaintiffs allege that they "wish immediately to exercise their constitutional right to carry a firearm in public for self-defense, but they are precluded from doing so because they are unable to obtain a Carry License . . . and because California law prohibits them from carrying a firearm openly." *Id.* ¶ 23. CRPA alleges that many of its members in Los Angeles County have applied for but been denied CCW

permits, or have refrained from applying for such permits based on a belief that they are not obtainable. *Id.* ¶ 22, 62, 63.

Purporting to state claims under the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs' Complaint, at pages 19 and 20, sought declaratory and injunctive relief against enforcement, by the California Attorney General and the Los Angeles County Sheriff, of California's open-carry laws, identified as California Penal Code sections 25850,[1] 26350,[2] 26400,[3] and 26150(b)(2).[4]  Alternatively, Plaintiffs sought declaratory and injunctive relief against the "good cause" requirement for a concealed-carry permit, as set forth in California Penal Code section 26150(a)(2).

## B.   The Motion to Dismiss

In response to defendants' early motion to dismiss, the Court determined that *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc), foreclosed Plaintiffs' requested remedies regarding concealed carry.  The Court dismissed the Second Amendment claim based on concealed carry, leaving the Second Amendment claim "based on the open carry limitations."  Order on Motion to Dismiss ("Order"; ECF No. 39) at 6.[5]

---

[1] "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory."  CAL. PENAL CODE § 25850(a).
[2] "A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following: (A) A public place or public street in an incorporated city or city and county. (B) A public street in a prohibited area of an unincorporated area of a county or city and county. (C) A public place in a prohibited area of a county or city and county."  CAL. PENAL CODE § 26350(a)(1).
[3] "A person is guilty of carrying an unloaded firearm that is not a handgun in an incorporated city or city and county when that person carries upon his or her person an unloaded firearm that is not a handgun outside a vehicle while in the incorporated city or city and county."  CAL. PENAL CODE § 26400(a).
[4] "Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, [the sheriff may issue] a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person."  CAL. PENAL CODE § 26150(b)(2).
[5] The Court dismissed the Equal Protection Clause claim as duplicative of the Second Amendment claim, Order at 7, and also dismissed the Los Angeles County
(continued…)

MEMO OF P's & A's RE:  MTN. FOR SUM. JUDGMENT (2:16-cv-06164-JAK-AS)

## STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## RELEVANT SUBSTANTIVE LAW

The Ninth Circuit uses a two-step inquiry for Second Amendment claims: "first, the court asks whether the challenged law burdens conduct protected by the Second Amendment; and if so, the court must then apply the appropriate level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)

The first step considers whether the challenged law burdens conduct protected by the Second Amendment, based on a "historical understanding of the scope of the right." *Silvester*, 843 F.3d at 820 (quoting *Heller*, 554 U.S. at 625).  If the law falls outside the historical scope of the Second Amendment, then that law "may be upheld without further analysis." *Id.*, 843 F.3d at 821 (citation omitted).

"If the regulation is subject to Second Amendment protection . . . the court then proceeds to the second step of the inquiry to determine the appropriate level of scrutiny to apply," and then to apply that level of scrutiny. *Silvester*, 843 F.3d at 821 (citation omitted).  This process requires the court to consider "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Id.* (citation omitted).  If the law *either*

_____

(…continued)
Sheriff from the case, *id.* at 1, 8.

MEMO OF P's & A's RE:  MTN. FOR SUM. JUDGMENT (2:16-cv-06164-JAK-AS)

1   does not come close to the core *or* otherwise does not "substantially" burden the

2   right, then intermediate scrutiny applies.  *Jackson v. City & Cty. of San Francisco*,

3   746 F.3d 953, 961 (9th Cir. 2014)

4       The core of the Second Amendment, as described in *Heller*, is "the right of

5   law-abiding, responsible citizens to use arms in defense of hearth and home."  *See*

6   *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Heller*, 554 U.S. at

7   635).  "A law that imposes such a severe restriction on the fundamental right of self

8   defense of the home that it amounts to a destruction of the Second Amendment

9   right is unconstitutional under any level of scrutiny," whereas a "law that implicates

10   the core of the Second Amendment right and severely burdens that right warrants

11   strict scrutiny.  Otherwise, intermediate scrutiny is appropriate."  *Bauer*, 858 F.3d

12   at 1222 (internal quotation marks and citations omitted).

13       The Ninth Circuit's test for intermediate scrutiny has two requirements:

14   "(1) the government's stated objective must be significant, substantial, or

15   important; and (2) there must be a 'reasonable fit' between the challenged

16   regulation and the asserted objective."  *Silvester*, 843 F.3d at 821-22 (citation

17   omitted).

18   **ARGUMENT**

19       The Second Amendment does not confer, as Plaintiffs assert, a general right to

20   carry arms (openly or otherwise) in any non-sensitive public place, based on only a

21   presumed or asserted need for self-defense.  California's open-carry laws do not

22   conflict with the Second Amendment, as historically understood and as

23   contemplated in *Heller*.  *Heller* recognized that the scope of the right varies in

24   different circumstances.  As to the historical understanding of carry in public

25   places, California's statutes regulate firearms in very much the same way that

26   firearms have been regulated in public places in many states from before the

27   "founding era" (roughly the time of the American Revolution until the start of the

28   Civil War) to the present day, without perceived conflict with the Second

7

Amendment.  The statutes do not impose absolute restrictions, but rather allow for the carrying of a firearm in public in many circumstances.

For similar reasons, even if California's open-carry laws do implicate the Second Amendment, the statutes are subject to intermediate rather than strict scrutiny, because they do not come close to the core of the Second Amendment right, self-defense in the home, or severely burden the exercise of the right.  They readily withstand intermediate scrutiny.  The laws are motivated by indisputably important governmental objectives, including reducing violent crime and protecting public safety.  And expert opinion, social-science data, and common sense establish that there is a reasonable fit between California's open-carry laws and the fulfillment of those objectives.

## I.   CALIFORNIA'S OPEN-CARRY LAWS DO NOT BURDEN CONDUCT HISTORICALLY UNDERSTOOD TO BE PROTECTED BY THE SECOND AMENDMENT

The first step of the Second Amendment analysis requires "examining whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood." *Silvester*, 843 F.3d at 821 (citing *Heller*, 554 U.S. at 625).  A court may summarily uphold a firearm law that can be traced to the founding era, because such a law was historically understood to fall outside the Second Amendment's scope.  *Id*.  Even firearm laws dating to only the first few decades of the 20th century may be summarily upheld, if the laws have been sufficiently pervasive and significant since that time period.  *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).

In contrast to the near-total ban on firearm possession in the home at issue in *Heller*, this case considers much less restrictive regulations in a context outside the home—non-sensitive public places.[6]  Far from eradicating firearm possession or

---

[6] Plaintiffs do not contend that the Second Amendment confers a right to publicly carry arms in sensitive public places.  *See* Compl. ¶¶ 2, 36, 66, 78 (referring to non-sensitive public places).

MEMO OF P's & A's RE:  MTN. FOR SUM. JUDGMENT (2:16-cv-06164-JAK-AS)

1   use, California's open-carry laws restrict most people from engaging in specific

2   conduct, and only in certain circumstances.  Indeed, the Supreme Court in *Heller*

3   has recognized that at least some regulation of the public carrying of firearms has

4   long coexisted with, and thus does not violate, the Second Amendment.  *See Heller*,

5   554 U.S. at 595, 626-27.

### A.   Widespread, Substantial Restrictions on Open Carry in Public Places Date Back Many Centuries in Anglo-American Tradition

8       "[P]ersuasive historical evidence" demonstrates that California's open-carry

9   laws do not infringe on the Second Amendment right as it was historically

10  understood.  *Silvester*, 843 F.3d at 821 (citing *Heller*, 554 U.S. at 625).  In

11  considering the constitutionality of regulations on the concealed carry of firearms,

12  the *Peruta* opinion delved deeply into the history of the regulation of *all* public

13  carry of firearms, and provided the foundational evidence that strict restrictions of

14  open carry represent the Anglo-American tradition dating back centuries.  Other

15  sources of history corroborate the *Peruta* interpretation.

### 1.   Restrictions on Open Carry in England, 1300-1800

17      *Peruta* describes in detail how in England from the late 13th century through

18  the late 18th century, because of the Statute of Northampton and related royal

19  proclamations, it was generally unlawful to "go armed," with concealed or open

20  weapons, in public places—and *Peruta* also found that the prohibitions were well-

21  enforced.  *Peruta*, 824 F.3d at 929-33.  Case law from the late 17th century and

22  commentary from prominent legal scholars from the first half of the 18th century

23  confirm that the Statute of Northampton restricted the public (concealed or open)

24  carry of firearms, regardless of how inconspicuous the carrying was.  Patrick J.

25  Charles, *The Faces of the Second Amendment Outside the Home: History Versus a*

26  *Historical Standard of Review*, 60 Clev. St. L. Rev. 1, 10-13 (2012); *Peruta*, 824

27  F.3d at 931-32 (discussing cases).

28

### 2. Restrictions on Open Carry in the American Colonies and the United States, Before and Just After the Civil War

#### a. Statutes

The Statute of Northampton, and its associated general prohibition on the public carry of firearms, pervaded America during the Colonial Era (before the American Revolution).  *See* Charles, 60 CLEV. ST. L. REV. at 32.  And in the late 18th century through the middle of the 19th century (before the Civil War), a significant number of the new U.S. jurisdictions adopted versions of that statute, including North Carolina, Massachusetts, Wisconsin, Maine, Michigan, Virginia, Delaware, Minnesota, Oregon, Pennsylvania, and the District of Columbia.  *See* Charles, 60 CLEV. ST. L. REV. at 32-35; *see also* Request for Judicial Notice in Support of Defendant's Motion for Summary Judgment ("RJN"), Ex. 4.

Many of these jurisdictions adopted a slightly relaxed version of the statute, which historians refer to as the "Massachusetts Model," and which included an express exception to allow a firearm to be carried in public in cases of exigent threats to persons and/or property.  *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373, 402-03 (2016).  "What distinguished the Massachusetts Model from its English predecessor was that it provided a statutory exception if the individual was able to demonstrate an 'imminent' or 'reasonable' fear of assault or injury to his or her person, family or property."  *Id*. at 403; *see also* Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law:  Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11, 39-40 (2017) (Massachusetts public carry law revised in 1835 "prohibited armed travel, but it recognized an exception in cases where a person had a reasonable cause to fear imminent violence," and "states and localities across the nation used it as a model for enacting limits on public carry").  "Maine, Delaware, the District of Columbia, Wisconsin, Pennsylvania, West Virginia, Oregon, and Minnesota all adopted

1    variants of the Massachusetts Model."  Charles, 64 CLEV. ST. L. REV. at 402.  This

2    evolution in the Statute of Northampton appears to be the source for California's

3    exigent-circumstances exception to the general restriction on public carrying of

4    firearms, which thus has a historical pedigree that favors its constitutionality.

5                              **b.    Case Law**

6         Case law from the 1800s, while not uniform regarding the open carry of

7    firearms, provides substantial support for the notion that in most places in the

8    country it was unlawful to carry a firearm in public.  A primary example is the

9    Supreme Court of North Carolina's 1843 opinion in *State v. Huntley*, 3 Ired. 418,

10   420-22 (1843), stating, on the authority of Blackstone, Hawkins, and Sir John

11   Knight's case, that it had long been a violation of the common law for a person to

12   ride or go armed with dangerous or unusual weapons, because such an act terrifies

13   other people.  The court in *Huntley* stated:

14        A gun is an "unusual weapon," wherewith to be armed and clad.  *No man
          amongst us carries it about with him, as one of his every day
15        accoutrements—as a part of his dress*—and never we trust will the day
          come when any deadly weapon will be worn or wielded in our peace
16        loving and law-abiding State, as an appendage of manly equipment.

17   *Id.* at 422 (emphasis added).  A person "shall not carry about [a gun] or any other

18   weapon of death to terrify and alarm, and in such manner as naturally will terrify

19   and alarm, a peaceful people."  *Id.* at 423; *accord*, *Lanier*, 71 N.C. at 289.

20        Other noteworthy examples include *Andrews v. State*, 50 Tenn. 165 (1871), in

21   which the Supreme Court of Tennessee upheld as constitutional a restriction on

22   open carry.  "As to arms worn, or which are carried about the person, not being

23   such arms as we have indicated as arms that may be kept and used [military arms

24   and other arms useful for military training], the wearing of such arms may be

25   prohibited if the Legislature deems proper, absolutely, at all times, and under all

26   circumstances."  *Id.* at 182.  And in 1882 the Supreme Court of North Carolina

27   pointed out that the common-law restrictions on open carry remained in force after

28

1   the North Carolina Legislature (in 1879) passed a statute banning concealed carry.

2   *See State v. Roten*, 86 N.C. 701, 704 (1882).

3       Courts in a few Southern slave states issued opinions that align with Plaintiffs'

4   position in this case, to the effect that there is an individual, general right to carry a

5   firearm in public, and legislatures therefore may not restrict both concealed carry

6   and open carry.  *See*, *e.g.*, *Nunn v. State*, 1 Ga. 243 (1846).  However, as shown by

7   the case law above, and as one scholar has reported, "[t]he only persuasive evidence

8   for a strong tradition of permissive open carry is limited to the slave South."  Saul

9   Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical*

10  *Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1722-23 (2012)

11  (footnotes omitted).

### c.   Local Regulations

13      Throughout the Western United States in the second half of the 19th century,

14  prohibitions on open carry were enacted at the local level, and were commonplace.

15  Town ordinances in the famous frontier outposts of the West, places like

16  Tombstone, Arizona, and Dodge City, Kansas, required newcomers to hand their

17  guns over to the sheriff or leave them with their horses at the stables on the

18  outskirts of town.

> In the frontier towns . . . where people lived and businesses operated, the law often forbade people from toting their guns around.  Frontier towns . . . adopted blanket ordinances against the carrying of weapons by anyone.  The carrying of dangerous weapons of any type, concealed or otherwise, by persons other than law enforcement officers . . . was nearly always proscribed . . . .  A visitor arriving in Wichita, Kansas, in 1873 would have seen signs declaring, "LEAVE YOUR REVOLVERS AT POLICE HEADQUARTERS, AND GET A CHECK."  A grainy, black-and-white photograph of Dodge City taken around 1879 shows a huge wooden billboard posted in the middle of the main road through town that says, "THE CARRYING OF FIREARMS STRICTLY PROHIBITED."

25  Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 13,

26  165 (2011) (internal punctuation omitted); *see also* Charles, 64 CLEV. ST. L. REV at

27  403, 419-22 nn.160, 245 (2016) (describing public-carry bans in numerous cities in

28  the years 1866 to 1914).

### 3.   Restrictions on Open Carry in the United States in the 1900s

Open-carry restrictions persisted and became more widespread in the 20th century.  For example, in 1901, Kansas passed a law authorizing city councils of small cities "to prohibit and punish the carrying of firearms or other deadly weapons, *concealed or otherwise* . . . ."  RJN, Ex. 4 at 071.  In 1905, the Supreme Court of Kansas upheld that law against a challenge under the Kansas Bill of Rights provision governing the right to bear arms.  *City of Salina v. Blaksley*, 83 P. 619, 621 (Kan. 1905).  By 1933, firearm-carry restrictions had proliferated to the point that a contemporary commentator stated that "in the United States . . . it is recognized that, in the proper exercise of the police power, the carrying of weapons by the individual may be regulated, restricted, and even prohibited by statute."  John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400, 413 (1934).

### B.   *Heller* and Other Modern Cases Recognize that Public Carry of Firearms Has Been Historically Regulated, Consistent with the Second Amendment

As described above, the historical record establishes that prohibitions on open carry of firearms in public places—which laws were much stricter than California's modern open-carry regulations, which contain many exceptions—pre-date the Second Amendment in England and persisted in America for at least a century after the ratification of the Second Amendment.  The generalized open-carry right sought by Plaintiffs is contradicted by the historical evidence of commonplace regulation of public carry of firearms.  If there is any historical basis for a right to carry in public, such a right, at most, would apply in only those situations where some particularized circumstance gives rise to a particular justification.

This understanding is consistent with *Heller*, in which the Supreme Court relied upon three 19th-century state-court decisions that address the right to keep and bear arms as applied in public places.  554 U.S. at 627 (citing *Langford*, 10

N.C. at 383; *English*, 35 Tex. at 477; and *Lanier*, 71 N.C. at 289).  Thus *Heller* recognized that at least some regulation of the public carrying of firearms has long coexisted with, and so does not violate, the Second Amendment.  *See id.* at 595, 626-27.

This understanding that the historical evidence does not support the generalized open-carry right sought by Plaintiffs is also consistent with the findings of most courts that have addressed public-carry regulations after *Heller.  See, e.g., Drake v. Filko*, 724 F.3d 426, 432, 434 (3d Cir. 2013) (noting that "[m]any recent judicial opinions have discussed historical laws regulating or prohibiting the carrying of weapons in public," and finding that "'the justifiable need' standard of the Handgun Permit Law is a longstanding regulation that enjoys presumptive constitutionality"); *Kachalsky v. County of Westchester*, 701 F.3d 81, 94-95, 96 (2d Cir. 2012) (finding "a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety" and concluding that such regulation "was 'enshrined with[in] the scope' of the Second Amendment when it was adopted") (quoting *Heller,* 554. U.S. at 634).[7]  Although two cases have struck down public-carry regulations, neither changes the analysis here.  One involved a more restrictive, "blanket" prohibition on carrying firearms in public. *Moore v. Madigan,* 702 F.3d 933, 939, 940 (7th Cir. 2012) (discussed below).  The other—*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017)—is currently the subject of a petition for en banc review and is in any event unpersuasive.[8]

## C.    The D.C. Circuit's Opinion in *Wrenn* is Not Persuasive

Based on a flawed historical analysis, the D.C. Circuit in *Wrenn v. District of Columbia* recently held that the Second Amendment guarantees to every

---

[7] The courts in *Drake* and *Kachalsky* went on to assume application of the Second Amendment and upheld the laws at issue under intermediate scrutiny.  *Drake*, 724 F.3d at 434; *Kachalsky*, 701 F.3d at 96.
[8] On August 24, 2017, the District of Columbia filed a petition for rehearing en banc of the *Wrenn* decision.

MEMO OF P's & A's RE:  MTN. FOR SUM.
                                                      JUDGMENT (2:16-cv-06164-JAK-AS)

1    "responsible citizen" a right to carry a firearm in public—including in crowded

2    cities—for the purpose of self-defense and without a special self-defense need.

3    *Wrenn*, 864 F.3d at 667.  *Wrenn*'s holding derives from misinterpretations of

4    significant elements in vintage case law and regulations on public carry.

5        *Wrenn* mischaracterized historic decisional law on public carry.  It

6    unjustifiably ascribed nationwide significance to a few judicial opinions from the

7    antebellum South—*Nunn*, 1 Ga. 243; *State v. Chandler*, 5 La. Ann. 489 (1850);

8    *Cockrum v. State*, 24 Tex. 394 (1859); *inter alia*—that together suggested that a

9    state may not ban outright both concealed carry and open carry; one or the other

10   alternative must remain available.  864 F.3d at 658.  However, as noted above,

11   those case decisions reflected a viewpoint accepted in only one geographic region

12   of the country.  *See*, *e.g.*, Cornell, 39 FORDHAM URB. L.J. at 1722-23.  That

13   minority viewpoint could not authoritatively contradict the historical mainstream

14   understanding of the Second Amendment that prevailed in a much larger swath of

15   the country (as discussed above).  And, *Cockrum*, the Texas Supreme Court opinion

16   in this line of cases, was effectively overruled in just a dozen years.  *English*, 35

17   Tex. 473.  In sum, the Southern slave state cases are irreconcilable with firearms

18   regulations prevalent in the rest of the United States.

19       *Wrenn* also erroneously relied on *Johnson v. Tompkins*, 13 F. Cas. 840 (E.D.

20   Penn. 1833), as supposed evidence of a historically understood constitutional right

21   to carry a firearm in public without a specific, self-defense related need.  864 F.3d

22   at 658.  The *Johnson* opinion, which is in the form of a trial judge's charge to a

23   jury, addressed a complaint of a slaveholder, Caleb Johnson, for false imprisonment

24   and/or trespass that he allegedly experienced in the course of an attempt to

25   recapture a runaway slave.  *See* 13 F. Cas. at 840-43.  Johnson had gone armed

26   from New Jersey to Pennsylvania to recapture a slave known as "Negro Jack."  *Id.*

27   By a ruse, Johnson got inside the home of the family protecting Jack, and "arrested"

28   him, bound him in chains, and tried to take him back to New Jersey and a life of

15                MEMO OF P's & A's RE:  MTN. FOR SUM.
                  JUDGMENT (2:16-cv-06164-JAK-AS)

more slavery. *Id*. In instructing the jury to deliberate over Johnson's claims about trespass and false imprisonment (in a tavern), the court held that there could be no dispute that Johnson "clearly" owned Jack, in the same way that another person owns "land" or "goods," because "the law of the land recogni[z]es the right of one man to hold another in bondage, and that right must be protected from violation." *Id*. at 843. The court went on to confirm that Johnson had related rights, including "a right to carry arms in defen[s]e of his property or person, and to use them" in the recapture of Jack. *Id*. at 852. *Wrenn* highlights that passage—about a slaveholder's supposed right to carry arms in the specific circumstance of capturing by force another human being—as exemplifying a historical understanding of a general right to carry firearms in public for self-defense without special self-defense need. 864 F.3d at 658. But the *Johnson* holding is more narrow. It supports the public carrying of a firearm in the specific, atypical, and abominable context of perpetrating a kidnapping of a slave. Nothing in *Johnson* supports the proposition that there is a Second Amendment right to carry a firearm in public without special self-defense need.[9]

While mistakenly elevating in importance the cases discussed above, *Wrenn* simultaneously discounts or ignores the above-cited, prevalent restrictions on open carry enacted into law between the 1790s and the 1860s in numerous U.S. jurisdictions. Relying on the overturned panel opinion in *Peruta*, *Wrenn* would in effect erase all those laws and supporting case decisions from U.S. history. *See* 864 F.3d at 664. However, the prevalence of laws restricting public carry of firearms before the Civil War remains a historical fact and is direct evidence of the early American understanding of the Second Amendment. *Heller* itself affirmatively cites some of the judicial opinions that *Wrenn* would dismiss. *See Heller* 554 U.S. at 627 (citing *English*, 35 Tex. at 474).

---

[9] *Wrenn* also curiously makes reference to *Andrews v. State*, 50 Tenn. 165 (1871), a decision that *affirms* the constitutionality of open-carry laws. 864 F.3d at 658.

MEMO OF P's & A's RE:  MTN. FOR SUM.
JUDGMENT (2:16-cv-06164-JAK-AS)

1    *Wrenn* thus misreads or mischaracterizes nearly every significant aspect of the

2    history of public-carry regulations in the United States.  For almost the entirety of

3    U.S. history, many states and localities have imposed restrictions on the public

4    carry of firearms that are irreconcilable with a general right to carry for self-defense

5    without special need, and almost all courts adjudicating constitutional challenges to

6    those laws upheld them.

7    **II.    IF CALIFORNIA'S OPEN-CARRY LAWS IMPLICATE THE SECOND
         AMENDMENT, THE LAWS SHOULD BE EVALUATED UNDER
8        INTERMEDIATE SCRUTINY**

9        If the Court determines, or chooses to assume, that the Second Amendment

10   protects conduct regulated by California's open-carry laws, the Court would choose

11   an appropriate level of scrutiny by considering "(1) how close the challenged law

12   comes to the core of the Second Amendment right, and (2) the severity of the law's

13   burden on that right."  *Silvester*, 843 F.3d at 821 (citation omitted).  "A law that

14   implicates the core of the Second Amendment right and severely burdens that right

15   warrants strict scrutiny.  Otherwise, intermediate scrutiny is appropriate."  *Bauer*,

16   858 F.3d at 1221 (citations omitted).   Both factors weigh in favor of intermediate

17   scrutiny here, although either factor weighing in that direction would compel

18   application of intermediate scrutiny.  *Jackson*, 746 F.3d at 961.

19       Again, the core of the Second Amendment, as described in *Heller*, is "the right

20   of law-abiding, responsible citizens to use arms in defense of hearth and home."

21   *See Bauer*, 858 F.3d at 1221-22 (quoting *Heller*, 554 U.S. at 635).  Consequently,

22   "[t]he state's ability to regulate firearms and, for that matter, conduct, is

23   qualitatively different in public than in the home."  *Kachalsky*, 701 F.3d at 94; *see*

24   *also Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("intermediate

25   scrutiny applies to laws that burden [any] right to keep and bear arms outside of the

26   home" (internal quotation marks and citation omitted)); *Kolbe v. Hogan*, 849 F.3d

27   114, 138 (4th Cir. 2017) (applying intermediate scrutiny to law restricting

28   possession of assault weapons and large-capacity magazines, because law "does not

1   severely burden the core protection of the Second Amendment, i.e., the right of

2   law-abiding, responsible citizens to use arms for self-defense in the home").

3       By definition, California's open-carry laws have no impact on self-defense in

4   the home.  This necessarily means that these laws do not burden the core of the

5   Second Amendment right.  The right that Plaintiffs posit, and that *Wrenn* seems to

6   acknowledge, extends to almost all public places and presumes a self-defense need

7   in all of those places.  Were that right deemed a core right, it would radically

8   expand the core and jeopardize nearly every regulation of people possessing

9   firearms.

10       Even if the core of the Second Amendment right could be interpreted to extend

11   to carrying firearms for self-defense beyond the home, California's laws do not

12   impose a severe burden on that right, because the laws have numerous, well-

13   considered exceptions, including an exigent-circumstances exception for instances

14   in which there is a specific need to have a firearm for defense of self, other persons,

15   or property, as well as an exception for a person who has obtained a restraining

16   order against another person.  *See* CAL. PENAL CODE §§ 26045(a) (permitting

17   carrying a loaded firearm to protect persons or property from immediate, grave

18   danger); 26045(b) (restraining order exemption); 26362 (exigent-circumstances

19   exception for open carry of unloaded handgun).  And a California resident of a

20   county with less than 200,000 people may obtain a permit to carry a handgun

21   openly there, consistent with the policies of local law enforcement authorities.  *See*

22   CAL. PENAL CODE §§ 26150(b)(2), 26155(b)(2).  As of January 1, 2017, thirty of

23   California's fifty-eight counties have populations of less than 200,000, according to

24   estimates by the California Department of Finance.  Li Decl., Ex. 3.  California's

25   open-carry laws thus stand in sharp contrast to the "blanket," statewide Illinois

26   public-carry prohibition that the Seventh Circuit invalidated in *Moore,* 702 F.3d at

27   939, 940.  That prohibition had no exigent-circumstances exception, and did not

28   provide for concealed carry with a permit, or open carry in low-population areas.

MEMO OF P's & A's RE:  MTN. FOR SUM.
                                           JUDGMENT (2:16-cv-06164-JAK-AS)

1   *Id.* at 934, 937.  Thus, by either and both of the two relevant factors, intermediate

2   scrutiny is the appropriate level of scrutiny in the present case.

3   **III.   CALIFORNIA'S OPEN-CARRY LAWS SATISFY INTERMEDIATE SCRUTINY**

4        California's open-carry laws survive intermediate scrutiny because they serve

5   at least reasonably well the important governmental objective of protecting public

6   safety.

7        **A.   California Has a Significant Interest in Protecting Public Safety**

8        California's objective in enacting its open-carry regulations, as reflected in

9   their legislative history, is to prevent or at least reduce the danger to public safety

10  created by firearms in public places.  See RJN, Ex. 1 at 029.  As law enforcement

11  authorities testified to the California Legislature, when someone exposes a (loaded

12  *or* unloaded) firearm in public, other people become alarmed and call for peace

13  officers to defuse the situation.  *Id.* at 030.  A deadly confrontation may ensue

14  between the person openly carrying a firearm and the responding peace officer, so

15  the open-carry laws minimize the chances for such confrontations.  *Id.*; *see also id.*

16  at 041-043, 045, 049-051, 057-058; RJN, Ex. 2 at 021, 030, 043, 055-060, 064-067,

17  072-073 (all similar).  Indeed, several of the individual plaintiffs here testified in

18  their depositions that the open carry of firearms tends to alarm members of the

19  public and law enforcement officers, and that criminals are likely to use greater or

20  deadly force when attacking someone carrying a firearm openly.  *See* Li Decl., Exs.

21  1-3; Defendant's Statement of Uncontroverted Facts, lines 1-7.

22       This public safety objective is undeniably significant.  The concurring opinion

23  in *Peruta*, which was adopted by the majority *en banc* court, acknowledged a

24  significant governmental interest in precluding a dangerous proliferation of firearms

25  in the streets.  *See* 824 F.3d at 942-43 (citing three other federal circuit court

26  decisions); *id.* at 942 ("[I]f we were to reach [intermediate scrutiny], we would

27  entirely agree with the answer the concurrence provides").  "'It is self-evident' that

28

MEMO OF P's & A's RE:  MTN. FOR SUM.
JUDGMENT (2:16-cv-06164-JAK-AS)

1  public safety is an important government interest." *Jackson*, 746 F.3d at 965

2  (quoting *Chovan*, 735 F.3d at 1139).

### B.   There Is a Reasonable Fit Between California's Open-Carry Laws and the Protection of Public Safety

5       California's open-carry laws also satisfy the second requirement under

6  intermediate scrutiny, that there be a "reasonable fit" between the laws and the

7  asserted governmental interest.  The open-carry laws directly advance the objective

8  of protecting public safety, by reducing violent-crime rates, conserving law

9  enforcement resources, and protecting law enforcement officers and the public from

10 unnecessary and potentially dangerous confrontations.

### 1.   "Reasonable fit" Requires Deference to the Legislature's Judgment

13      To establish a "reasonable fit," "[t]he State is required to show only that the

14 regulation 'promotes a substantial government interest that would be achieved less

15 effectively absent the regulation.'"  *Silvester*, 843 F.3d at 829 (quoting *Fyock*, 779

16 F.3d at 1000).  The laws at issue need not be the "least restrictive means" of

17 achieving the government's objective.  *Fyock*, 779 F.3d at 1000 (citation omitted).

18 Nor does the government need to demonstrate that the laws will or do, in fact,

19 accomplish the desired result.  "Sound policymaking often requires legislators to

20 forecast future events and to anticipate the likely impact of these events based on

21 deductions and inferences for which complete empirical support may be

22 unavailable."  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994).  The

23 Supreme Court has "permitted litigants to justify . . . restrictions [under

24 intermediate scrutiny] by reference to studies and anecdotes pertaining to different

25 locales altogether, or even, in a case applying strict scrutiny, *to justify restrictions*

26 *based solely on history, consensus, and simple common sense.*"  *Lorillard Tobacco*

27 *Co. v. Reilly,* 533 U.S. 525, 555 (2001) (emphasis added) (internal quotation marks

28 and citation omitted).

Intermediate scrutiny recognizes that "[i]t is the legislature's job, not [the court's], to weigh conflicting evidence and make policy judgments." *Kachalsky*, 701 F.3d at 99; *see also Drake*, 724 F.3d at 439 (noting that "conflicting empirical evidence . . . does not suggest, let alone compel, a conclusion that the 'fit' between [a state's] individualized, tailored approach and public safety is not 'reasonable'"); *accord Peruta*, 824 F.3d at 919, 944 (Graber, J., concurring).  Thus, in applying intermediate scrutiny, courts "must accord substantial deference to the predictive judgments" of legislative bodies.  *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997).

### 2.    California's Open-Carry Laws Reduce Violent Crime and Enhance Public Safety

There is a "reasonable fit" between California's open-carry laws and the important governmental interest in protecting public safety.  Limitations on the open carry of firearms in public help to lower violent-crime rates.  Such limitations also enhance public safety by conserving law enforcement resources and protecting law enforcement officers and the public from unnecessary and potentially dangerous confrontations.

### a.    California's Open-Carry Laws Reduce Violent Crime

As set forth in the expert report and testimony of Defendant's expert witness, Stanford Law Prof. John J. Donohue III, California's open-carry laws bolster public safety by minimizing firearm violence.  Prof. Donohue has determined that the enactment of permissive concealed-carry laws around the country in the last 30 years has led to significantly increased rates of violent crime (murder, rape, robbery, and aggravated assault) in those jurisdictions; and, for multiple reasons, the results from the generally more recent enactment of permissive open-carry laws, for which there is negligible data so far, can be expected to be even worse.

Defendant submitted to Plaintiffs an expert report of Prof. Donohue (Li Decl., Ex. 7), and he was cross-examined by Plaintiffs' counsel for two days in

depositions.  The expert report includes as an attachment, and the depositions covered at length, Prof. Donohue's (and two co-authors') soon-to-be-officially-published academic study, National Bureau of Economic Research, Inc., Working Paper Series, Working Paper w23510, "Right-to-Carry Laws and Violent Crime:  A Comprehensive Assessment Using Panel Data and State-Level Synthetic Controls Analysis."  Li Decl., Exs. 8 and 9.  The study applies two kinds of statistical methodologies (panel data analysis and synthetic controls analysis) to multiple statistical models (one crafted by Prof. Donohue, and other models previously crafted and used by other scholars—some of whom have advocated that public-carry laws lead to significantly reduced rates of violent crime), evaluating a large set of data about violent crime, as well as murder specifically.  Here are, in brief, the major findings of the Donohue study:

(1) The decline in American violent crime rates in the last generation has been far greater in U.S. states without laws permitting public carry of firearms (negative 42 percent), compared with other states that enacted laws permitting public carry (negative 9-10 percent).  Li Decl., Ex. 9 at 007.

(2) At a level of statistical significance of 99 percent, the U.S. states that enacted laws permitting public carry increased police employment at the same time—yet, as noted above, on a relative basis, rates of violent crime were still much higher there compared with states that did not enact laws permitting public carry of firearms.  Li Decl., Ex. 9 at 008.

(3) Processing 37 years of nationwide data on violent crime through four different statistical models, employing panel-data analysis, uniformly the results indicate, at statistically significant levels, that permissive public-carry laws lead to increased rates of violent crime and/or murder.  Li Decl., Ex. 9 at 007.

(4) Processing violent-crime data from 33 U.S. states through the four statistical models, but this time employing synthetic-controls analysis, the results indicate, at statistically significant levels, that permissive public-carry laws lead to

1   violent crime rates of that are 7 percent higher after five years, and 15 percent

2   higher after 10 years.  Li Decl., Ex. 9 at 031-035.

3       (5) "[T]he weight of the evidence from the panel data estimates as well as the

4   synthetic controls analysis best supports the view that the adoption of RTC laws

5   substantially raises overall violent crime in the ten years after adoption."  Li Decl.,

6   Ex. 9 at 037-038.

7       At deposition, Prof. Donohue summarized the study as follows:  "[O]ne of the

8   main conclusions of the paper is that right-to-carry laws, on balance, seem to be

9   ticking up your violent crime rate . . . into the neighborhood of 13 to 15 percent

10  after ten years."  Li Decl., Ex. 4 at 124:3-124:9.  In ongoing empirical research,

11  Prof. Donohue has processed the separate, "disaggregated" data for each category

12  of violent crime, in the same manner that was used on the aggregated data in the

13  study reported in the working paper, "[a]nd . . . it pretty much conformed to the

14  findings of what we saw here" in the study.  Li Decl., Ex. 4 at 114:22-114:23.  "The

15  synthetic controls estimates, regardless of the particular set of explanatory variables

16  that was used, showed a highly statistically significant impact on aggravated assault

17  rising when right-to-carry laws were [adopted]."  Li Decl., Ex. 5 at 353:16-353:20.

18  And, open carry poses all the same risks, plus others, such as the high likelihood

19  that significant numbers of people will at times tire of carrying their guns, and put

20  them down, in their cars or elsewhere, facilitating widespread firearm thefts that

21  will result in many more guns in the hands of criminals.  *See* Li Decl., Ex. 4 at

22  122:1-124:10.

23      In addition to Prof. Donohue's recent findings, another new study also

24  provides strong support for a finding that California's open-carry laws help to

25  reduce firearm violence.  This study, by Prof. Michael Siegel of the Boston

26  University School of Public Health (and other authors) reports robust results

27  indicating a statistically significant relationship between the passage of "shall-

28  issue" public-carry laws and increases in total homicides (6.5 percent), firearm

MEMO OF P's & A's RE:  MTN. FOR SUM.
JUDGMENT (2:16-cv-06164-JAK-AS)

homicides (8.6 percent), and handgun homicides (10.6 percent).  Li Decl., Ex. 11, Michael Siegel et al., "Easiness of Legal Access to Concealed Firearms Permits and Homicide Rates in the US States," AMERICAN JOURNAL OF PUBLIC HEALTH (forthcoming; currently embargoed), at 003:9-10, 0012:217-0013:243.

### b.   California's open-carry laws enhance public safety

The expert report and testimony of Defendant's expert witness, former Covina Chief of Police, Kim Raney ("Chief Raney") also support a finding of a reasonable fit between California's open-carry laws and the protection of public safety.  In Chief Raney's opinion, "restrictions on the open carry of firearms greatly enhance public safety," and such restrictions "have been critical to the safety of law enforcement officers, our communities, and those people who would want to openly carry firearms in public."  Li Decl., Ex. 10, ¶¶ 21, 22.  According to Chief Raney, California's open-carry laws promote public safety in the following ways:

(1)  Reducing the likelihood of deadly confrontations between individuals in public.  "A person armed with a firearm may decide to use deadly force where it is not clearly required, creating a deadly situation that did not exist before."  Li Decl., Ex. 10, ¶ 30.

(2) Preserving law enforcement resources by reducing calls for service regarding armed persons.  Open carry "has the high potential to create panic and chaos, and would result in an immediate law-enforcement response."  Li Decl., Ex. 10, ¶ 28.  *See also id*. ¶¶ 22, 26, 29; Li Decl., Ex. 6, 107:7-107:20, 103:8-103:17.

(3) Reducing law enforcement's need to engage in potentially deadly encounters.  Law enforcement encounters with armed persons have the potential to be extremely dangerous, for officers and civilians.  *See* Li Decl., Ex. 10,  ¶¶ 24, 27; Li Decl., Ex. 6, 78:15-79:3.

(4) Reducing unnecessary diversion of law enforcement resources and attention when responding to active shooter or other firearms-related situations. The presence of openly carried firearms at or near a crime scene complicates the

law enforcement response and poses a dangerous distraction.  Li Decl., Ex. 10, ¶¶ 23, 25; Li Decl., Ex. 6, 62:14-62:22, 68:24-69:1.

### c.  Defendant's Evidence Establishes a "Reasonable Fit" Sufficient to Survive Intermediate Scrutiny

As demonstrated by the opinions of Defendant's experts, and by common sense about the likely effects of the open carry of firearms in public places, the California Legislature would have had more than sufficient grounds to conclude that California's open-carry laws serve the governmental objectives of bolstering public safety and minimizing violence.  Defendant has provided evidence that satisfies the "reasonable fit" standard in support of its motion. *See Silvester*, 843 F.3d at 829; *Fyock*, 779 F.3d at 1000.  Defendant is therefore entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment adverse to Plaintiffs.

Dated:  September 11, 2017                     Respectfully submitted,

XAVIER BECERRA
Attorney General of California
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General
P. PATTY LI
Deputy Attorney General

/s/ Jonathan M. Eisenberg
JONATHAN M. EISENBERG
Deputy Attorney General
*Attorneys for Defendant Xavier Becerra, Attorney General of the State of California*

MEMO OF P's & A's RE:  MTN. FOR SUM. JUDGMENT (2:16-cv-06164-JAK-AS)